CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 27 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

ROGER E. HICKS,          )
                         )
    Plaintiff,      )
                         )          Case No.: 7:17-cv-00247
v.                       )
                         )
                         )
CARILION MEDICAL CENTER, )
                         )          By:    Michael F. Urbanski
    Defendant.      )          Chief United States District Judge

## MEMORANDUM OPINION

This case comes before the court on Defendant Carilion Medical Center's

("Carilion") motion for summary judgment, filed on October 29, 2018. ECF No. 57.

Plaintiff Roger E. Hicks ("Hicks") responded on November 19, 2018, ECF No. 61, and

Carilion responded on December 3, 2018, ECF No. 62. Judge Dillon heard argument on

December 12, 2018. ECF No. 66. For the reasons stated below, Carilion's motion is

**GRANTED**, all claims are **DISMISSED**, and this case is **STRICKEN** from the active

docket.

## I.

Hicks began working for Carilion in Guest Services in 2013, but shortly thereafter

was moved to the Main Operating Room ("OR") as a perioperative technician ("POT").[1]

ECF No. 61-1, at 39. Carilion is an Equal Employment Employer and prohibits any type of

workplace violence. ECF No. 57-11, at 28. Hicks was aware of this and was provided with

---

[1] Specifically, Hicks worked at Carilion Roanoke Memorial Hospital, a hospital within the Carilion umbrella. ECF No. 57, at 2.

some training concerning Carilion's policies prohibiting harassment and workplace violence, though the extent and efficacy of that training is disputed.[2] ECF No. 61-1, at 63–68.

Christopher Kurtz was unit director in the main operating room and Hicks's immediate supervisor. ECF No. 57-4, at 3. Kurtz's evaluation of Hicks's job performance during 2013 and 2014 was positive; Kurtz wrote in his 2014 review that Hicks "conduct[ed] himself professionally, provide[d] excellent patient care and [was] pleasurable to work with." ECF No. 61-13, at 3. In January 2015, after a split in management structure that put POTs and perianesthesia technicians ("PATs") in different billing and management departments, Kurtz asked that Hicks coordinate the POT schedule. ECF No. 1.

Hicks claims that the complained-of harassment and discrimination began with the change in his position responsibilities. ECF No. 1. Hicks believes the problems to be race-based and claims that Tommy Yerkey, a Carilion PAT who had previously coordinated the schedule before the split in departments, was "offended by Hicks, a black man, taking his job duties." ECF No. 61, at 2. Hicks testified during his deposition that at this time, no other African-American had been given extra responsibilities and his coworkers had never had a problem with white coworkers receiving these sorts of responsibilities. ECF No. 61-1, at 38. Hicks testified that, once he began coordinating the schedule, "all hell broke loose, and I really feel that it was because I was black," id. at 38, but also testified that no one ever directly told him that race was the reason for any dislike, id.

---

[2] When asked about the level of harassment and sensitivity training, Nurse and Carilion employee Shelby Azar answered, "We have an annual in-service that we have to complete on the computer; every employee is required to complete that, about harassment and discrimination." ECF No. 61-2, at 8.

Hicks claims that his coworkers began "tearing down" and "ripping up" the paper copies of the schedules he made. ECF No. 61-1, at 32. He testified that there were many times when his white coworkers "went to Chris Kurtz and fabricated a lie, just for no reason at all...There were those type of incidents that ensued." ECF No. 61-1, at 46. Hicks recounts one incident which involved coworker Becky Russell, a PAT who, after an incident in which Hicks correctly identified a thoracotomy, complained to Yerkey that "they think they know everything," and then filed a complaint against Hicks with Kurtz. Id. at 49. Hicks assumed that "they" referred to African-Americans because he was the only African-American POT and "the only black person of these crews that was in school." Id. at 52. Hicks admitted that Russell never said anything that explicitly indicated her resentment was race-based but testified that she never made such remarks about a white POT. Id.

Several distinct incidents, however, are alleged in the complaint and documented by Carilion employment records. See ECF No. 1. The first of these occurred in December 2014 when Hicks was pushed by a Caucasian coworker, Paul "Alex" Perdue, just after Hicks had returned to work after taking leave for back surgery. Id. at 3; ECF No. 61-1, at 58. Hicks and corroborating witness Yussef Musa claim that the discussion leading to the incident focused on football but devolved into Perdue calling Hicks "Roger Dicks" and Hicks showing his identification badge to Perdue to convince Perdue to use the correct name. ECF No. 61-1, at 58; ECF No. 57-7, at 2. Perdue was terminated following an investigation into the event. ECF No. 57-4, at 6–7.

In early August of 2015, Hicks had another altercation, this time with Darryl Perry, a PAT. ECF No. 61-1, at 98. John Johnson, an African-American Clinical Team Leader, and

Bryan Hodges, another PAT, both witnessed the event. Id. Hicks was walking down the hallway and had forgotten to wear his OR hat. Id. When Johnson pointed this out to him and reminded him to put his hat on, Hicks claims Perry called him "an idiot" and a "fucking faggot." Id. Hodges and Perry, on the other hand, claimed in emails sent to manager Billy Belcher that Hicks had called Perry an idiot, and that Hicks had a history of aggressive, unprofessional behavior. ECF No. 57-11, at 33–35. Hicks reported the incident to Belcher and left a message on "7-Safe," an anonymous hotline used at Carilion.[3] ECF No. 61-1, at 76. He claimed he received no response. Id. In his deposition, Hicks admitted that the terms "idiot" and "faggot," while of course offensive, are race-neutral. Id. at 71.

On August 24, 2015, Hicks sent an email to Carilion CEO Nancy Agee reporting that he was experiencing harassment; the email mentioned the incident with Darryl Perry directly. ECF No. 61-22. See also ECF No. 61-9, at 7. Agee forwarded this letter to Heather Shepardson, the Vice President of Human Resources, who sent it to HR Consultant Naomi Powers. ECF No. 61-22. On February 10, 2016, Hicks sent another email to Agee, again asking for assistance. ECF No. 61-9, at 8. The end result of these complaints was that Hicks was transferred from weekday shifts to weekend shifts to avoid future problems with coworkers. ECF No. 61-1, at 189. This was a largely positive change—the transfer was accompanied by a pay increase and seemed to resolve Hicks's workplace complaints for several months. ECF No. 61-1, at 187.

---

[3] 7-Safe is "a hot line that [employees] call and [ ] report safety concerns, any sort of untoward[ ] behavior of a physician or environmental safety concerns, equipment failure concerns, [and] employee behavior…you leave a message." ECF No. 61-2, at 6.

On July 22, 2016, Hicks had a final altercation with Philip Muse, an African-American POT. ECF No. 61-1, at 145–46. Hicks alleges that he was speaking with Johnson about a case when Muse heard his name mentioned in the course of the conversation. Id. At this point, Hicks claims that Muse said, "Don't let me hear you speak my name out of your mouth, bitch ass n****r." Id. Muse denies having made this comment, and Johnson denies having heard it. ECF No. 57-2, at 8; ECF No. 57-10, at 2. Another alleged confrontation occurred later that day; Muse reported to Kurtz that Hicks threatened to "knock [him] out in the parking lot at 7 pm." ECF No. 57-11, at 10. Four individuals sent email statements regarding either one or both of these confrontations stating that Hicks was the aggressor. ECF No. 57-11, at 10–16.

Hicks was suspended and escorted off the property following this incident on Carilion's belief that there was a "very good chance" that Hicks's threats against Muse were serious. ECF No. 57-11, at 2. Powers conducted an investigation, for which she interviewed Hicks and six other employees. See id. at 73–78. Powers concluded that Hicks was the instigator of both confrontations. Id. at 78. No one interviewed during this investigation other than Hicks claimed to have heard Muse use a racial slur. See id. at 73–78. Stephen Lovern, Senior Director of Operating Room Services; Gary Schott, his superior; and Shepardson all made the decision to terminate Hicks. ECF No. 57-5, at 8.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with…[any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and may prevail by showing "an absence of evidence to support" an essential element of the nonmoving party's case. Celotex, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward with specific material facts that prove there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Although "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor,'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment. Anderson, 477 U.S. at 252. Rather, a genuine issue of material fact exists only "if there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

Hicks brings two counts in his Complaint pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. ECF No. 1. Count I is a Claim for Race Discrimination, alleging that Carilion "discriminated against plaintiff in violation of federal law in that [Carilion]:

(a) classified plaintiff on the basis of his race;
(b) discriminated against plaintiff with respect to the terms, conditions, or privileges of employment because of his race;
(c) permitted a work environment to exist at defendants' facility that was racially offensive and hostile to African-American workers, including plaintiff;
(d) harassed and retaliated against plaintiff because of his race and for complaining about defendants' discriminatory practices; and
(e) terminated plaintiff's employment because of plaintiff's race."

Id. at 4–5. Count II brings a Claim for Retaliatory Discharge and alleges that Carilion "discriminated against plaintiff in violation of federal law in that defendants harassed and retaliated against plaintiff and terminated his employment for complaining about the harassment and hostile work environment in violation of Title VII of the Civil Rights Act of 1964..." Id. at 8–9.

In these two counts, there seem to be three potential claims: (1) hostile work environment (Count I); (2) racial discrimination through adverse employment action (Count

I); and (3) retaliation (Count II). ECF No. 1, at 4–9. Hicks fails to make a showing that a reasonable factfinder could find for him on any of these three claims, for the reasons explained below.

## A.

The standard used to evaluate a racial hostile work environment claim under § 1981 is the same as that used under Title VII. 42 U.S.C.A. § 1981; 42 U.S.C.A. § 2000e; Freeman v. Dal-Tile Corp., 750 F.3d 413, 427 n.7 (4th Cir. 2014). To survive summary judgment on a claim of a racially hostile work environment, plaintiff must show that a reasonable jury could find the harassment was: (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) known to the employer who failed to take effective action to stop it. E.E.O.C. v. Xerxes Corp., 639 F.3d 658, 669 (4th Cir. 2011). In deciding whether an employer has created an abusive working environment, the court must examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or merely an offensive utterance, and whether it unreasonably interfered with an employee's work performance. Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2014).

Hicks has provided more than sufficient evidence that the behavior he faced at Carilion was unwelcome, but the record is conflicted as to whether any of the alleged harassment was based on race. Of the incidents Hicks reports, only one involves an explicitly race-based slur—Hicks's contention that Muse called him a "bitch ass n****r." The other incidents make no mention of race, but this on its own does not bar a reasonable fact-finder

from concluding they were, in fact, motivated by racial animus. See Martin v. Merck & Co., Inc., 446 F. Supp. 2d 615, 629 (W.D. Va. 2006) (examining the context in which two incidents of harassment that made no mention of race occurred and finding that a reasonable fact-finder could conclude these incidents were based on race). The court may examine the surrounding circumstances of these incidents, including the time period in which they occurred, the individuals involved, and how a reasonable person might interpret what was said and done. Id.

Hicks's explanation for these difficulties, however, is contested by many of his coworkers. More than one fellow Carilion employee described Hicks as aggressive and angry. Muse stated that Hicks was "mean" and would refer to others as "dumb." ECF No. 57-2, at 4–5. Other, less potentially biased individuals also reported behavioral issues with Hicks. Johnson, someone of whom Hicks thought highly and trusted, ECF No. 61-1, at 23, stated that he witnessed Hicks have conflicts with coworkers but never saw anything that led him to believe the problems were race-based, ECF No. 51-10, at 1. Instead, Johnson testified that he had heard Hicks call coworkers "dumb" and "stupid," and that Hicks "seemed angry, like he had a chip on his shoulder." Id.

While Russell, in remarking that "they" think they know everything, made no explicit mention of race, the court finds that a reasonable factfinder could perhaps conclude by a preponderance of the evidence that this was a race-based comment, due to the context in which it occurred. The derogatory words Perry is alleged to have used are, as Carilion points out and Hicks concedes, race-neutral, but context and past experience with a coworker can color any exchange, and "[f]acially neutral incidents may be sufficient to establish a hostile

work environment claim" if there is "some circumstantial or other basis for inferring that incidents that are [race]-neutral on their face were in fact discriminatory." Fleming v. MaxMara USA, Inc., 644 F. Supp. 2d 247, 262–63 (E.D.N.Y. 2009). Granting Hicks an assumption of credibility and making all reasonable inferences in his favor, a reasonable factfinder could perhaps conclude that Perry's comments were racially motivated, given the racial make-up of the staff, the shift in Hicks's role, and the past incidents alleged. See ECF No. 61-5, at 3 (Hicks was the only African-American POT besides Muse); ECF No. 61-1, at 238 (Hicks never heard Perry call a white employee a "faggot" or an "idiot"); id. at 32 (other employees tore down Hicks's schedules); id. at 49 (Russell complaining to Yerkey).

Of course, the alleged use of the slur "n****r" is undoubtedly race-based. See McFinest v. GTE Service Corp., 360 F.3d 1103, 1116 (9th Cir. 2014) ("It is beyond question that the use of the word 'n****r' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination."). The word is perhaps the single English word most particularly "expressive of racial hatred and bigotry." Swinton v. Potomac Corp., 270 F.3d 794, 817 (9th Cir. 2001). Carilion points out that Muse denies having ever said anything like what Hicks alleges, ECF No. 57-2, at 8, and that Johnson, who witnessed the entire event, corroborates his account, ECF No. 57-10, at 2 (Johnson states in his affidavit, "At no time during the altercation between Muse and Hicks did I hear Muse call Hicks any racially derogatory name, including 'bitch ass n****r.' If I had heard that term, I would have reported it to Human Resources and put it in the attached e-mails describing what I saw and heard."). Carilion also argues that Muse himself is African-American, and thus even assuming the event occurred as Hicks claims, it likely was not motivated by Hicks's race.

ECF No. 57, at 21. Carilion cites to <u>Currie v. Arthur</u>, No. 1:11-cv-892, 2012 WL 1715390, at *4 (E.D. Va. May 15, 2012), in which the plaintiff claimed that a watermelon with a hole in it left on his work station by an African-American coworker constituted an incident of race-based harassment. The court expressed doubt as to whether any jury could find that a watermelon left by one African-American on the desk of another African-American was racially motivated. <u>Id.</u>

In <u>Towne v. Eisner</u>, 245 U.S. 418, 425 (1918), Justice Holmes remarked that "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." At least one court has, however, refused to support an employer who took action against a white employee for use of the word "n****r" while taking no action against African-American employees for use of the same. <u>See</u> <u>Burlington v. News Corp.</u>, 759 F. Supp. 2d 580, 597 (E.D. Penn. 2010). Fortunately, the court need not wade into this thorny, historically-loaded, and potentially inflammatory issue. Hicks's failure to provide enough of a showing that the harassment alleged was sufficiently severe and pervasive or that Carilion was negligent in its control of the workplace environment mandates the dismissal of this claim.

The "'severe or pervasive' element of a harassment claim has both a subjective and an objective component." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22 (1993). To determine if a work environment was objectively hostile, the court must look to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating rather than a mere offensive utterance, whether it

unreasonably interferes with work performance, and what psychological harm resulted. See Harris, 510 U.S. at 21-23; Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 193 (4th Cir. 2000). This standard is a "demanding" one. Faragher, 524 U.S. 775, 788 (1998). No one is guaranteed "refinement and sophistication" in their interactions at work. Martin v. Merck & Co., 446 F. Supp. 2d 615, 628–29 (W.D. Va. 2006). Rather, they are protected only from "harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997).

Hicks's description of the Carilion work environment is far from ideal. The record makes clear that Hicks had issues with numerous coworkers. Even if Hicks's account is accepted in full, however, these incidents are not sufficiently severe or pervasive to alter the conditions of employment and create a hostile work environment. Hicks worked at Carilion for approximately three years. See ECF No. 61-1, at 39. The alleged harassment did not begin until 2015, more than a year after he was hired. See ECF No. 1. After this point, Hicks's complaint mentions three specific confrontations: (1) Perdue pushing him after a conversation about sports; (2) Perry calling him an "idiot" and a "faggot"; and (3) Muse calling him a "bitch-ass n****r." See generally ECF No. 1. Besides these, Hicks recounts instances of coworkers fabricating complaints against him and Russell complaining to Yerkey that "they" think they know everything in a conversation that was overheard by Hicks but was not meant to include him. Making all logical inferences possible in Hicks's favor (as the court must in a summary judgment analysis), three direct confrontations, one overheard conversation, and complaints made out of Hicks's presence that (so far as the

record shows) resulted in no negative employment consequences cannot be found sufficiently severe or pervasive to form the basis of a hostile work environment claim. See ECF No. 61-1, at 55 (Hicks testifies that Kurtz did not discipline him in any way following Russell's complaint). See, e.g., Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."); Mustafa v. Iancu, 313 F. Supp. 3d 684, 695 (E.D. Va. 2018) ("Courts have routinely noted that where, as here, the alleged harassment involves isolated or scattered incidents occurring over the course of several months, the conduct is not pervasive enough to state a claim for hostile work environment."); Sonnier v. Diamond Healthcare Corp., 114 F. Supp. 3d 349, 357 (E.D. Va. 2015) (holding that three instances of harassment within a two month period is "relatively infrequent[ ]").

One of the key factors in this analysis is how many of these alleged incidents were not even directed at Hicks and occurred outside of his presence.[4] Take Hicks's complaint regarding Russell's discussion with Yerkey of how "they believe they know everything"— while the conversation concerned Hicks, he was not a participant in it and nothing said was directed at him. ECF No. 61-1, at 52. Second-hand harassment, while objectionable and unpleasant, is less concerning in a Title VII context than direct instances of aggression. Martin, 446 F. Supp. 2d at 629. White v. Federal Exp. Corp., 939 F.2d 157, 160 (4th Cir. 1991), dealt with a claim of a racially hostile work environment based on one incident of racially offensive remarks exchanged by black and white employees, conflicts regarding

---

[4] Hicks claims in his complaint that Yerger "talked down about [Hicks] to [Hicks's] subordinates." ECF No. 1, at 3.

music selection, allegations that black employees were admonished to return to work when white employees were not, and allegations of unequal advancement for black and white employees. The court noted that most of these incidents were not directed against the plaintiff and found no cause of action for a racially hostile environment. Id. Other courts have also rejected claims of a hostile work environment after examining incidents of indirect harassment. Martin, 446 F. Supp. 2d at 629, found that three plaintiffs could not show their work environment to be racially hostile after observing that several of the sixteen incidents reported were not directed at the plaintiffs, and some were not even witnessed. Discussions and complaints that take place behind someone's back might make their way back to that person and affect his experience in the workplace, but this is objectively less severe than insults and acts of aggression made face to face. See White, 939 F.2d at 160; Martin, 446 F. Supp. 2d at 629.

Besides this, none of the alleged harassment came from supervisors or managers at Carilion. See ECF No. 61-1 (none of the incidents recounted by Hicks involved any individual above him on the Carilion employment hierarchy). "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor," since "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." Sonnier v. Diamond Healthcare Corp., 114 F. Supp. 3d 349, 356 (4th Cir. 2015). Hicks had confrontations and negative interactions with several individuals at Carilion, but all were either on a similar rung on the employment hierarchy or in a different department that had no influence over his employment. See ECF No. 61-1 (Russell, Yerkey, and Perdue were all PATs, and Muse was a fellow POT). The fact that none of these

individuals wielded professional power over Hicks renders these instances less severe and heightens the showing Hicks must make to show a hostile work environment—a showing Hicks has not made. See Sonnier, 114 F. Supp. 3d at 356.

Finally, Hicks fails to show that Carilion did not take action to halt and prevent racial harassment. When a plaintiff is harassed by co-workers rather than a manager or a supervisor, an employer may only be held liable if that employer "was negligent in controlling working conditions." Boyer-Liberto, 786 F.3d at 278. If an employer knew or should have known about harassment and failed to take effective action to stop it, that employer becomes liable for the harassment. Id. If, however, an employer takes action and the action causes the harassment to cease, then the employer's liability ends. McKinney v. G4S Gov't Sols., Inc., 179 F. Supp. 3d 609, 625 (W.D. Va. 2016).

The record shows that Carilion took action following Hicks's complaints regarding race-based harassment. After Hicks was pushed by Perdue in December 2014, Kurtz questioned Hicks, Perdue, and numerous other witnesses to the incident in his capacity as a manager. ECF No. 57-4, at 6–7. Perdue was sent home on suspension immediately, pending the results of the investigation into the confrontation. Id. While Hicks received a "written performance improvement discussion" for what witnesses described as "violating [Perdue's] personal space]" with his employee badge, Perdue was fired after the investigation concluded that he had committed a physical act of violence in the workplace. Id. Carilion's response to the incident was prompt, thorough, and effective, and thus cannot be deemed negligent. See Bonenberger v. Plymouth Tp., 132 F.3d 20, 26 (3rd Cir. 1997) (stating that an employer's

remedial actions insulate it from liability if they are "reasonably calculated" to prevent further harassment).

After Hicks's confrontation with Perry in August 2015, Carilion again conducted an investigation and received differing accounts. Hicks claimed Perry called him an "idiot" and a "fucking faggot" without any provocation. Johnson and Bryan Hodges, another PAT who witnessed the event, both emailed their manager Billy Belcher and stated that Hicks had called Perry an idiot. Employer action taken to remedy complaints of harassment are judged under the circumstances of the harassment and the complaint, Henneman v. Airtran Airways, 705 F. Supp. 2d 1012, 1034 (E.D. Wis. 2010), and under these circumstances, Carilion had no clear indication of who was at fault for the incident.

Hicks claimed to have complained more than once of racial harassment but received no response, and so finally complained directly to CEO Agee.[5] ECF No. 61-22. This email was sent August 24, 2015, three weeks after his complaints to HR Consultant Powers and his 7-Safe call. Id. It was immediately forwarded to Shepardson and Powers. Id. Shepardson commenced an investigation into Hicks's complaints that included interviewing two African-American employees as to whether they had experienced racial issues. ECF No. 57-11, at 71. The investigation found no evidence of race-based harassment. Id. The court cannot agree that a three-week delay between complaint and action constitutes negligence. Neither can the court agree that an action taken was insufficient simply because Hicks did not agree with the end result. "[A] good-faith investigation of alleged harassment may satisfy the…response

---

[5] Hicks made a 7-Safe call reporting being harassed and specifically recounting his incident with Perry on August 7, 2015. ECF No. 61-32.

16

standard, even if the investigation turns up no evidence of harassment…" Harris v. L&L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997).

Nevertheless, Hicks sent another email to Agee six months later, on February 9, 2016. ECF No. 61-21. Following this, Hicks was switched to weekend shifts,[6] which seemed to end the alleged harassment for several months. ECF No. 57-4, 13–14. Carilion managers continued to check in with Hicks following the change. See ECF No. 57-11, at 21 & 68 (documenting messages and meetings with Hicks following the change in work schedule). Hicks experience no further significant difficulties until his last altercation with Muse. Following this confrontation, Carilion against responded with an immediate investigation that involved interviews with Hicks, Muse, and all other witnesses. That Hicks did not agree with the result again does not lead to the conclusion that Carilion was negligent. Harris, 132 F.3d at 984. Nothing in Carilion's handling of the situation indicates it failed to show due care in controlling its own work environment.

For the reasons explained above, Hicks fails to make a prima facie case of a hostile work environment under Title VII.

## B.

To establish a prima facie case of Title VII racial discrimination, Hicks must show: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. Sanders v. Tikras Technology Solutions Corporation, 725 Fed. App'x 228,

---

[6] According to the record of a meeting conducted on March 7, 2016, prepared by Stephen Lovern, Roger had "chosen to work the weekend shift so that he does not have to deal with some of the personalities that he finds difficult to work with." ECF No. 61-24.

230 (4th Cir. 2018). Under Title VII, Hicks may make this showing with direct and indirect evidence of animus or through the burden-shifting framework of <u>McDonnell Douglas Corp v. Green</u>, 411 U.S. 792 (1973) (the "McDonnell Douglas framework"). Under the McDonell Douglas framework, an employment discrimination plaintiff has the initial burden of production. <u>Mitchell v. Data General Corp.</u>, 12 F.3d 1310, 1315 (4th Cir. 1993). If such a plaintiff brings produces indirect evidence that establishes a prima facie case of discrimination, a presumption in favor of the existence of the unlawful discrimination arises and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 507 (1993). Assuming the employer produces such a reason, the burden shifts back to the plaintiff to show that this reason is pretextual. <u>Id.</u>

Over the course of Hicks's employment at Carilion, only two employment actions could potentially qualify as "adverse." The first was his transfer from weekday shifts to weekend shifts, in response to his complaints regarding harassment from his fellow employees. The second was his eventual termination. The court will address each action in turn.

Prior to Hicks's termination, the only change in his employment was a move to the weekend shift. As discussed above, the change was made following Hicks's initial complaints of harassment and was intended to remove the potential for future conflicts. This change in schedule actually resulted in Hicks receiving a greater hourly wage. When asked about the change during his deposition, Hicks agreed that the reassignment was a positive development. ECF No. 61-1, at 190 (Hicks referring to the weekend shifts as "a blessing").

Hicks's reassignment to the weekend shift cannot serve the role of "an adverse employment action" in a prima facie case for racial discrimination. Wagstaff v. City of Durham, 233 F. Supp. 2d 739, 746 ("A 'clear trend of authority' holds that a 'transfer that does not involve a demotion in form or substance [ ] cannot rise to the level of a materially adverse employment action.'") (citations omitted).

Hicks's employment termination, on the other hand, was clearly an adverse employment action. As stated above, once a plaintiff in a Title VII racial discrimination action presents a prima facie case, the burden shifts to Carilion to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). This is a burden of production, not persuasion, and once it is met, Hicks must show by a preponderance of the evidence that the stated reason is not sincere, but a pretext for discrimination. Id. Carilion argues that Hicks cannot show different treatment from similarly situated employees outside the protected class, pointing to the termination of Perdue after he pushed Hicks. ECF No. 62, at 6. Carilion also argues that Hicks was not offering satisfactory job performance because of his confrontation with Muse and other difficulties with coworkers. ECF No. 57, at 16. Regardless of whether Hicks made a prima facie showing, Hicks's claim fails because Carilion has offered a legitimate, non-discriminatory, and non-pretextual reason for Hick's termination.

As recounted, Hicks's termination occurred after his July 22 incidents with Muse, during which three witnesses claimed Hicks threatened Muse, and later another witness claimed Hicks confronted and threatened Muse again. Following these episodes, Hicks was

suspended and escorted off company property. HR Consultant Powers investigated the incidents and interviewed Hicks and six other employees. Based on the investigation, Powers concluded that Hicks had been the aggressor. Senior Director Lovern consulted with his superior Gary Scott and Vice President Shepardson. The decision was made that Hicks represented a potential safety risk and thus his employment needed to be terminated.

The conclusion that Hicks had violated Carilion's workplace violence policy represents a legitimate, non-discriminatory reason for discharge. Holland v. Wash. Homes, Inc., 487 F.3d 208, 216–17 (4th Cir. 2007) (firing someone for threatening behavior is a legitimate, non-discriminatory reason for termination). Hicks offers no reason to believe this explanation is pretextual; nothing in the record suggests that Lovern, Scott, or Shepardson did not believe that Hicks represented a potential safety risk. See id. at 213 ("[plaintiff] presented no evidence that could show that [defendant's] legitimate proffered reason for firing [him] was disingenuous..."). Hicks fails to defeat summary judgment under the McDonnell Douglas pretext framework.

## C.

Count Two fails because Carilion has offered a non-discriminatory reason for Hicks's discharge, and Hicks has failed to offer sufficient evidence for a reasonable jury to conclude the reason was pretextual. The McDonnell Douglas framework described above applies to both race discrimination claims and retaliatory discharge claims. Foster, 787 F.3d at 249. Powers's investigation into Hicks's confrontation with Muse makes perfectly plain the reasons for which Carilion fired Hicks. ECF No. 57-11, at 73–78. Powers states in her summary of the investigation that "it was stated by four witnesses that [Hicks] was the

aggressor and was loud and 'in [Muse]'s face," and that "these allegations follow a pattern of [Hicks]'s behavior witnessed in other situations in which [Hicks] has been involved in the past. Id. at 78. The decision to terminate Hicks's employment was made due to the results of this investigation. ECF No. 57-5, at 8. Of particular concern to Lovern in making the decision to fire Hicks was "the threat of violence"—he went on to testify, "Any time there is a potential safety issue…I can't trust that you [ ] are not going to do that again, and I can't put my patients at risk." Id. at 7–8.

Hicks argues against Carilion's assertion of a legitimate reason for termination by saying that Carilion suspended Hicks rather than Muse because Muse had never made a race discrimination complaint and that Carilion "never even had a meeting to decide what to do about the employee who called Hicks a bitch ass n****r." ECF No. 61, at 25. Hicks goes on to claim that "the alleged 'violence' is comical" because "Hicks…never touched Muse, never met in the parking lot, no one called the police, and Hicks did nothing to try to stop Muse from going to the office." Id. None of this reflects on Carilion's perception of the incident between Hicks and Muse. What matters here is not the truth or falsity of Carilion's belief that Hicks was the aggressor, but that Carilion sincerely held this belief. Holland v. Wash. Homes, Inc., 487 F.3d 208, 220 (4th Cir. 2007) ("[Defendant] has put forth uncontested evidence that it terminated [Plaintiff] because its decisionmaker believed that [Plaintiff] was making threats toward his supervisor. Whether [Plaintiff] actually made these threats is irrelevant in this context because it is uncontested that the decisionmaker believed that he did.").

As stated above, Carilion has offered evidence of a legitimate, nondiscriminatory, non-pretextual reason for firing Hicks. Hicks has failed to rebut Carilion's claim that this reason was genuine and sincere. Accordingly, Count II fails.

**IV.**

For the reasons stated above, the court now **GRANTS** Carilion's motion. Both counts of Hicks's complaint are **DISMISSED** and this case is **STRICKEN** from the active docket.

An appropriate Order shall be issued this day.

Entered: This 27 day of March, 2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge